**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

03 JUN -2 AM 9: 05

N.D. OF ALABAMA

| | | |
|---|---|---|
| JONATHAN R. BORDEN, | ) | |
| PLAINTIFF, | ) | |
| VS. | ) | CV-02-H-551-S |
| ALABAMA COOPERATIVE EXTENSION SYSTEM AT AUBURN UNIVERSITY, | ) ) | |
| DEFENDANT. | ) | |

**ENTERED**

**JUN - 2 2003**

## MEMORANDUM OF DECISION

The court has before it the April 3, 2003 motion of
defendant Alabama Cooperative Extension System at Auburn
University ("ACES") for summary judgment.  Pursuant to the
court's April 11, 2003 order, the motion was deemed submitted,
without oral argument, on May 12, 2003.

### I. Procedural History

Plaintiff Jonathan R. Borden commenced this action on March
1, 2002 by filing a complaint in this court alleging violations
of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e and
42 U.S.C. § 1983.  Plaintiff contended that defendant's alleged
conduct constitutes (1) race discrimination, (2) retaliation and
(3) hostile work environment.  Defendant's April 3, 2003 motion
for summary judgment asserts that plaintiff has failed to rebut
defendant's legitimate and nondiscriminatory reasons for the
conduct at issue and that defendant is therefore entitled to



summary judgment.

Both parties have filed briefs and submitted extensive evidence in support of their respective positions.  Defendant submitted evidence[1] in support of its own motion for summary judgment on April 3, 2003 and filed a supporting brief on April 17, 2003.  On May 5, 2003, plaintiff filed evidence[2] in opposition to defendant's motion for summary judgment.  On May 12, 2003, plaintiff filed a brief in opposition to the defendant's motion.

---

[1] The defendant submitted the following: volumes one and two of Jonathan Borden deposition with exhibits; Dr. Gaines Smith deposition with exhibits; Linda Schotz deposition with exhibits; Jimmy Smitherman deposition with exhibits; Jerry Jackson deposition with exhibits; Sandra Spencer deposition with exhibits; Jack Tatum deposition with exhibits; Emily Kling deposition with exhibits; Barbara Duncan deposition with exhibits; John Pulliam deposition with exhibits; Dr. Warren McCord deposition with exhibits; Callie Nelson affidavit with exhibits; Betty Holley affidavit with exhibits; Emily Kling affidavit with exhibits; Dr. Gaines Smith affidavit with exhibits; Barbara Duncan affidavit; Dr. Charlotte Sutton affidavit with exhibits; Judge Murphy's 10/02 order; declaration of Mary Bush; FBI investigation file; transcript of plaintiff's exhibit 41; plaintiff's first bankruptcy filing; and plaintiff's second bankruptcy filing.

[2] The plaintiff submitted the following: exhibits to Jonathan Borden deposition; exhibits to Linda Schotz deposition; exhibits to Jack Tatum deposition; exhibits to John Pulliam deposition; exhibits to Jimmy Smitherman deposition; exhibits to Jerry Jackson deposition; exhibits to Dr. Gaines Smith deposition; exhibits to Dr. Warren McCord deposition; exhibits to Barbara Duncan deposition; exhibits to Emily Kling deposition; exhibits to Sandra Spencer deposition; Mike Bentley affidavit; Kathy Rayfield affidavit; and Dr. James Smith affidavit.

## II. Standards for Evaluating a Summary Judgment Motion

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Chapman v. AI Transport, 229 F.3d 1012, 1023 (11th Cir. 2000)  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp., 477 U.S. at 323.  Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions of file, designate specific facts showing that there is a genuine issue for trial. Id. at 324.

The substantive law will identify which facts are material and which are irrelevant. Chapman, 229 F.3d at 1023; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. Chapman, 229 F.3d at 1023; Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir.

1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; Chapman, 229 F.3d at 1023.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  Anderson, 477 U.S. at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial.  See Fitzpatrick, 2 F.3d at 1115-17 (citing United States v. Four Parcels of Real Property, 941 F.2d 1428 (11th Cir. 1991)(en banc)).  If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial.  Fitzpatrick, 2 F.3d at 1115.  Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial.  Once the moving party satisfies its burden using this

4

method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to <u>affirmatively</u> show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question.  This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case.  <u>Fitzpatrick</u>, 2 F.3d at 1115-16.  If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts.  <u>Lewis v. Casey</u>, 518 U.S. 343, 358 (1996) (citing <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 561 (1992)).

### III. Relevant Undisputed Facts[3]

Plaintiff Jonathan Borden, an African-American male, began working as a Environmental Educator in August 1998 at the Shelby County 4-H Youth Development Center in Columbiana, Alabama. (See Borden Dep. Vol. I at 105-09.) Defendant ACES[4] operates that center which, among other things, provides a variety of educational programs, including environmental education, to visiting school children and operates a residential camp during the summer. (See Borden Dep. Vol. I at 131-32.)

Plaintiff holds a B.S. degree from Tuskegee University in Vocational Extension and Technical Education and a Masters degree in Environmental Analysis and Management from Troy State University. (See id. at 34-36.) He began working at ACES as a Youth at Risk Coordinator[5] in 1994 but resigned after a year and a half to attend graduate school full-time. (See id. at 47-49, 52.) While earning his Masters, plaintiff worked for the Adolescent Research Center in Dothan, Alabama, for Juvenile Court Services in Houston Country, Alabama. (See id. at 59-61.) He

---

[3] Facts are undisputed unless otherwise expressly noted. If the facts are in dispute, they are stated in the manner most favorable to the plaintiff. See Fitzpatrick, 20 F.3d at 1115.

[4] ACES is an agency affiliated with Auburn University, Alabama A&M University, the United States Department of Agriculture and county government bodies. (See G. Smith Dep. at 64.)

[5] Plaintiff also refers to this position as Program Developer. (See Borden Dep. Vol. I at 47.)

also worked as a Federal Probation Officer on temporary appointment[6] with the United States Probation Office for the Northern District of Alabama and for Bessemer Family Services Center before returning to ACES in August 1998 as an Environmental Program Educator.  (See id. at 62-63, 105-09.)

The environmental education staff at the 4-H Center reports to a Program Coordinator who in turn reports to the Manager of the 4-H Center, Sandra Spencer.  (See McCord Dep. at 32-33; Spencer Dep. at 23-24.)  The Manager reports to the State 4-H Leader, Dr. Warren McCord.[7]  (See id.)  The State 4-H Program Leader reports to the Associate Director for the Programs and then to the Director of the ACES, Dr. Gaines Smith.  (See McCord Dep. at 32-33.)

## A.  Program Coordinator

### 1.  The Position and Search Committee

On October 13, 2000 ACES began a search for the job of Extension 4-H Center Program Coordinator.  (See Borden Dep. Ex. 21.)  The job announcement described the Program Coordinator's duties as focused on developing and implementing environmental

---

[6] Plaintiff's appointment as a federal probation officer was not confirmed due to an unsatisfactory background check.  (See Borden Dep. Vol. I at 87-90; declaration of Mary Bush.)  The background check revealed numerous references to negative information from plaintiff's past employers.  (See FBI investigation file.)

[7] Sam Fowler became the State 4-H Center Leader in January 2003.  (See McCord Dep. at 28-29.)

education curricula and programs for use at the 4-H Center and in outreach programs.  (See id.)  Qualifications for the job included at least five years experience in "environmental education, program development and camping."  (Id.)  The last day to submit applications was November 10, 2000.  (See Borden Dep., Ex. 21.)  ACES employees, including plaintiff, received an e-mail from the then Director of ACES, Dr. Steve Jones, regarding the posting of the job and plaintiff also received a written copy of the job announcement.  (See Borden Dep. at 175-78, 259,  Exs. 14, 21.)

In October of 2000 a bi-racial search committee was formed to hire the new Program Coordinator.  (See Kling Dep. at 78-79; Spencer Dep. at 28-29.)  The committee included the following people: Extension Specialist, 4-H National Resources Emily Kling (white female) as chair;[8] County Extension Coordinator John Pulliam (black male); County Extension Coordinator Jimmy Smitherman (white male); Auburn University Associate Professor of Management Dr. Charlotte Sutton (white female); 4-H Center Agent Assistant Jerry Jackson (white male); and 4-H County Agent Callie Nelson (black female).  (See Borden Dep. Vol. I at 287; Kling Dep. at 59; Pulliam Dep. at 21-23; Smitherman Dep. at 17-18; Jackson Dep. at 25.)  In addition, Spencer attended the search

---

[8] Spencer and Dr. McCord named Emily Kling as the chair of the search committee based on her credentials and knowledge of environmental education.  (See Spencer Dep. at 28-29.)

committee interviews as an observer.  (See Spencer Dep. at 31-
32.)  Plaintiff applied for the position of Program Coordinator
along with seven other individuals.  (See Borden Dep. Vol. I at
258, 289.)

Prior to the interviews Kling sent the members of the search
committee each applicant's materials including a cover letter
instructing them to review the materials and prepare a rating
sheet[9] ranking the candidates prior to the committee's first
meeting.  (See Kling Dep. at 52-54, 91-92.)  At the first
committee meeting on January 5, 2001, the independent ratings
were totaled and the applicants were ranked by score.  (See id.
at 23-24; Smitherman Dep. at 27; Pulliam Dep. at 37.)  Based on
these ratings alone, Lynda Schotz ranked number one and plaintiff
ranked number two out of the eight applicants.  (See Kling Dep.
at 23-24.)  Additionally the committee reviewed and approved the
interview rating sheets and added three additional categories.
(See id. at 15-16; Smitherman Dep. at 31-32; Pulliam Dep. at 40.)
The committee also developed a set of uniform interview
questions.  (See Kling Dep. at 47-48; Smitherman Dep. at 21, 23.)
Each member was assigned specific questions to ask in each
interview; they also received training on conducting a proper

---

[9] As chair of the search committee Kling developed an
applicant rating sheet, interview rating sheet, interview "dos
and don'ts" and a reference check form.  (See Kling Dep. at 13-
15, 18-20, 84-85, 88.)

9

nondiscriminatory interview.  (See Smitherman Dep. at 23-24, 60; Pulliam Dep. at 25-26; Jackson Dep. at 29-30; Kling Aff. ¶ 5.)

## 2. The Interviews

Four of the eight applicants were invited for interviews for the Program Coordinator position: plaintiff, Carl Sloan, Kevin Butler and Lynda Schotz.  (See Borden Dep. Vol. I at 275-76.) Plaintiff and Kevin Butler were both Environmental Educators at the 4-H Center.  (See id. at 275.)  Lynda Schotz was the Director or Educational Programs at Legacy and a former Environmental Educator at the 4-H Center.[10]  (See Schotz Dep. at 26.) Plaintiff and Kevin Butler were interviewed on January 12, 2001 and Lynda Schotz and Carl Sloan were interviewed on January 19, 2001.  (See Borden Dep. Vol. at 298-300.)

Each interview began with a presentation prepared in advance by the applicant, and then each applicant was asked the uniform interview questions.  (See Smitherman Dep. at 38; Kling Dep. at 14.)  During the interview each committee member scored the applicants on the previously prepared interview rating sheets. (See Kling Dep. at 11-12, 14-15, 99-100; Pulliam Dep. at 37.)  In addition to the interview Kling spoke by telephone with each applicant's current or former supervisors and asked them a uniform set of questions adapted from a Human Resources form.

---

[10] She was one of the many individuals on the mass e-mail announcing the job.  (See Schtoz Dep. at 26, 40-41; Kling Dep. at 34, 156-57.)

(<u>See</u> Kling Dep. at 18-19. Ex. EK-2.)

### 3. **The Decision to Hire Schotz**

After all the interviews, the committee met and discussed the rankings of the four applicants who were interviewed. (<u>See</u> Kling Dep. at 39, 58-59.) Schotz received five first place rankings and one second place ranking. (<u>See</u> <u>id.</u> at 56-58, 167-68; Smitherman Dep. at 73-74; Jackson Dep. at 66.) Plaintiff received one first place ranking, four second place rankings and one third place ranking. (<u>See</u> Pulliam Dep. at 91; Kling Dep. at 56-58; Smitherman Dep. at 79.) The search committee recommended Schotz for the Program Coordinator position conditioned upon her returning for a second interview to clear up questions about her supervisory skills. (<u>See</u> Kling Dep. at 39-40, 167; Smitherman Dep. at 79, 83.) The one member who ranked plaintiff as the top candidate, Pulliam, yielded to the majority in this recommendation. (<u>See</u> Pulliam Dep. at 91.) Initially there was also discussion about having a second interview of the plaintiff but the committee decided against it.[11] (<u>See</u> Kling Dep. at 94; Smitherman Dep. at 80.) The committee recommended that if Schotz was not hired the vacancy should be re-announced and the search

---

[11] Pulliam stated that he thought plaintiff would be brought back for a second round of interviews. (<u>See</u> Pulliam Dep. at 29-31.) No other committee member recalled such a decision and the Supplemental Report of which Pulliam helped draft did not mention this decision. (<u>See</u> Kling Dep. at 94; Smitherman Dep. at 80; Pulliam Dep. at 81-82, Ex. JP-9.)

process continued.  (See Kling Dep. at 188-89; Duncan Dep. at
125-27; Smitherman Dep. at 87-88.)

During the search committee discussions regarding the
plaintiff, Kling raised an issue regarding plaintiff's Legacy
service.  (See Kling Dep. at 106-08.)  Kling reported to the
committee her discussion with Dr. Betty Holley, a member of the
Legacy Board of Directors and current President of Legacy,
regarding Legacy's alleged problems with plaintiff's lack of
participation on the board and committees and that Legacy no
longer wanted plaintiff to participate in any of Legacy's
activities.  (See Kling Dep. at 61, 101, 147, 106-08; Holley Aff.
¶ 5.)  One member of the committee, John Pulliam, recalls Kling
also reporting that plaintiff turned in travel mileage for
reimbursement for a Legacy meeting that he did not actually
attend.[12]  (See Pulliam Dep. at 50.)  Additionally, Kling stated
that she believed that Legacy should think highly of the 4-H
Center personnel because the Program Coordinator would be
interacting with the members of Legacy, which provided funding
and equipment to the 4-H Center.  (See Kling Dep. at 107-110.)

After the committee made the decision to hire Schotz, normal
practice called for the chair of the committee to draft a report
of the committee's recommendation.  (See McCord Dep. at 53-54.)
As such, Kling wrote a letter to Dr. McCord on January 19, 2001

---

[12] Kling denies making such comments.

12

informing him that the search committee recommended Schotz for Program Coordinator conditioned upon a second interview[13] and included the report. (See id. at 45; Kling Dep. at 188-89, Ex. EK-28.)   In that report, Kling noted "[t]here was some discussion about calling Jonathan Borden back for another interview.   But since it was decided . . . there was a question about his ethics, the committee decided not to call him back for an interview." (See Ex. 28 to Kling Dep.)   Schotz was subsequently interviewed by Dr. McCord, Sandra Spencer and Emily Kling.   (See Borden Dep. Vol. I at 305; McCord Dep. at 49; Kling Dep. at 41; Spencer Dep. at 128; Pulliam Dep. at 33; Smitherman Dep. at 79.)   After this second interview, it was decided that Schotz should receive the job pending the approval of the Director and University chain of command.   (See McCord Dep. at 56-57; Spencer Dep. at 130-133.) However, Dr. McCord did not offer Schotz the job until after a reconvening of the search committee.   (See McCord Dep at 65.)

### 4.  Reconvened Search Committee

After plaintiff learned that he was not selected for the position[14] and that there had been comments made about his

---

[13] The purpose of this interview was to have an opportunity for Spencer to clarify expectations of the job and to discuss some concerns that had been raised about additional development Schotz might need to undertake.   (See McCord Dep. at 50-51; Schotz Dep. at 117.)   Subsequently, Schotz did take several recommended courses.   (See Schotz Dep. at 118.)

[14] Kling telephoned plaintiff (as well as the other unsuccessful candidates) and informed him that he was not

service on the Legacy board, plaintiff complained to the
Associate Director of Human Resources, Barbara Duncan, a black
female, and requested that she investigate the situation.  (See
Borden Dep. Vol. I at 303-04; Borden Dep. Vol. II at 19; Duncan
Dep. at 17.)  He indicated that he believed that he was not
selected because of his race.  (See Borden Dep. Vol. I at 309-10,
341, Ex. 29.)

After receiving plaintiff's complaint and reviewing the
report prepared by Kling, Duncan had concerns with the language
in the report questioning plaintiff's "ethics."  (See Duncan Dep.
at 49-50.)  She spoke with Kling and decided to reconvene the
search committee so that she could speak with all the committee
members and understand the search process.  (See id. at 51-57.)
The search committee was reconvened on February 26, 2001; the
Executive Director of Affirmative Action/EEO for Auburn
University, Janet Saunders, a black female, also attended the
meeting.  (See Borden Dep. Vol. II at 18-19; Kling Dep. at 49,
159; Pulliam Dep. at 59-60; Duncan Dep. at 56-57, 66-67.)

At this meeting, Duncan distributed Kling's initial report
and discussed with the committee members the language Kling
included in the initial report regarding plaintiff's "ethics."
(See Duncan Dep. at 57; Kling Dep. at 160-61; Pulliam Dep. at 67,
95-96.)  The members assured Duncan that the rankings were

---

selected.  (See Borden Dep. Vol. I at 290, 303-04.)

14

correct and that they all agreed that Schotz should be
recommended for the job.  (See Duncan Dep. at 67-68, 70.)
Search committee members Pulliam, Smitherman, Jackson and Nelson
stated that they either did not consider Kling's comments or that
these comments did not influence their decision.  (See Pulliam
Dep. at 45, 50-51; Smitherman Dep. at 46, 48; Jackson Dep. at 68-
70; Sutton Aff. ¶ 5; Nelson Aff. ¶ 10.)  In addition, they
informed Duncan that they did not take into consideration the
comments made regarding plaintiff's Legacy service and that they
believed the search process was fair and according to policy.
(See Duncan Dep. at 72-73, 81-82.)  At the end of the meeting,
Duncan instructed the committee to write a new report reflecting
their decision and the information used in making that decision.
(See id. at 75-79.)  She did not recommend that the committee re-
interview plaintiff because she believed that the ethical comment
was not relevant to the original search.  (See id. at 73.)  A
supplemental report was written by committee member Dr. Charlotte
Sutton and each member reviewed and suggested changes.  (See
Kling Dep. at 158-59; Smitherman Dep. at 64, 68-71; Jackson Dep.
at 74, 76-77; Pulliam Dep. at 81-82; Sutton Aff. ¶ 6.)

    After the reconvened search committee meeting[15] and

_____

    [15] On April 2, 2001 Duncan informed plaintiff that she
investigated his complaints regarding the search process, that
the search committee reconvened and that she believed the ACES
followed proper procedures in filling the position.  (See Borden
Dep. Vol. II at 17-18, Ex. 36.)  Plaintiff then sent Duncan a

recommendation of Schotz, Dr. McCord completed the paperwork for approval to hire Schotz as the Program Coordinator and forwarded that paperwork for approval. (See McCord Dep. at 49-51, 69-71.) As of March 21, 2001 the Director of the ACES and the President of Auburn University approved the hiring of Schotz and Janet Saunders completed the approval process on March 23, 2001. (See Gaines Smith Aff. ¶ 4, Ex. 4.)

## B.  Plaintiff's Claims of Retaliation

### 1.  Public Reprimands

Plaintiff claims that after complaining about discrimination in the search committee process, he was subjected to harsher reprimands than others. (See Borden Dep. Vol. II at 38-40.) Plaintiff stated that in April of 2001, just after Schotz assumed the Program Coordinator position, she retaliated against him by subjecting him to public discipline in front of his peers for being late to two staff meetings and for submitting a report late. (See id. at 30, 35-36.)  He claims that others were merely reprimanded privately.[16]  (See id. at 35.)  Additionally,

---

letter on April 9, 2001 again raising his concerns with the process.  (See id. at 20-21, Ex. 37.)  Duncan responded on August 20, 2001 reiterating that the proper procedures had been followed.  (See id. at 24-25, Ex. 38.)

[16] However, plaintiff testified that Kathy Rayfield, a white female, was also late for the meeting, and Schotz called both plaintiff and Rayfield "slackers."  (See Borden Dep. Vol. II at 38-39.)  Plaintiff also produced a recording of a meeting in which Kevin Butler, a white male, complained about Schotz's reprimands of Butler.  (See id. at 44, Ex. 41, transcript of Ex.

plaintiff said Schotz used an aggressive tone when reprimanding him for being late to a meeting.  (See id. at 30, 32.)  At the time Schotz addressed plaintiff's tardiness and late submissions, Schotz had no knowledge of any complaints of discrimination by plaintiff.  (See id. at 33-34; Schotz Dep. at 58-59, 103.)

### 2. Merit Pay Raise

Plaintiff claims that Dr. McCord informed him that all ACES employees would receive a five percent merit raise in October 2002.[17]  (See Borden Dep. Vol. I at 200-01.)  However, plaintiff stated that he only received a 4.413 percent raise.  (See id.; McCord Dep. at 78.)  According to the plaintiff, when he questioned Dr. McCord about the lower percentage, Dr. McCord raised his voice and spoke to him in a "very strong tone of voice."  (See Borden Dep. Vol. I at 204.)  He said Dr. McCord stated that "he [was] definitely going to address this and deal with this issue" and that "they was going to make the necessary

---

41.)  Butler complained Schotz was "hostile" and "defensive;" that Schotz "yelled and screamed" at him for being late to meetings.  (See Transcript of Ex. 41 to Borden Dep. at 13, 31-32.)  Butler further complained that Schotz did not discipline all employees the same and did not yell at other employees who were late for meetings.  (See id. at 30-32.)

[17] Plaintiff's brief mistakenly states that the merit raises were in 2001.  (See Pl.'s Brief at 12.)  According to the evidence submitted to the court, the pay increases occurred on October 1, 2002.  (See Gaines Smith Aff. ¶ 7, Ex. 8.)  Additionally the plaintiff agreed that the increase occurred "back this fall," "before Christmas" at his deposition in January 2003.  (See Borden Dep. Vol. I at 204-05.)

adjustment."[18]   (See id.)

### 3. Grievance Procedures

On May 15, 2002 plaintiff filed a formal grievance with Sandra Spencer against Jerry Jackson.   (See Borden Dep. Vol. II at 103-04, 144-46, Ex. 57; Spencer Dep. at 154.)   This grievance was based upon Jackson's use of the word "boy" in reference to plaintiff in front of peers and co-workers.   (See Borden Dep. Vol. II at 103-04, 144-46.)   That day, Spencer forwarded this complaint to Barbara Duncan who forwarded plaintiff's complaint to the Office of Affirmative Action.   (See id. at 113-14, Ex. 59; Spencer Dep. at 154.)

The Affirmative Action/EEO officer contacted plaintiff to discuss his complaint, but plaintiff told them that he decided to go through the ACES complaint process instead.[19]   (See Borden

---

[18]   As of plaintiff's deposition in January 2003, however, this adjustment had not been made.   (See Borden Dep. Vol. I at 204.) On February 6, 2003 Dr. McCord wrote a confidential memo to Barbara Duncan stating the following:
> This is to confirm my conversation with you several weeks ago regarding the miscalculation of the recommended salary for Jonathan Borden.  I was not aware that you were waiting on written instructions from me to correct the miscalculation.  Please correct his salary increase . . . to reflect an increase of 5% . . . retroactively back to October 1, 2002.

(Gaines Smith Aff., Ex. 8.)   The increase was then implemented retroactively to the date of the original raise.   (See Gaines Smith Aff. ¶ 8.)

[19] There are a number of avenues for an employee to make a complaint and for handling of grievances as the ACES.   (See Borden Dep. Vol. II at 119-20; Gaines Smith Dep. at 41, 89-93.)

Dep. Vol. II at 119-20.)  After receiving a copy of plaintiff's complaint, Dr. Gaines Smith referred plaintiff to an EEO counselor.  (See Gaines Smith Dep. at 201.)  Plaintiff also wrote to Nelson Wynn, a County Extension Agent in Shelby County and a designated EEO Counselor for the ACES.  (See Borden Dep. Vol. II at 116-20, Ex. 58; Gaines Smith Dep. at 202.)  Wynn conducted an investigation including interviewing plaintiff, Jackson and other 4-H employees.  (See Borden Dep. Vol. II at 122.)  He concluded that the issue was still unresolved based upon plaintiff's statements regarding the present litigation.  (See id. at 128, 131.)  Wynn informed plaintiff that he would write up the problem as unresolved thus allowing plaintiff to request a formal hearing under the ACES EEO Program.  (See id. at 130, 132, Exs. 60-62, 64.)

On July 12, 2002 plaintiff submitted a letter of formal complaint to Dr. Gaines Smith regarding Jackson's comments and on July 16, 2002 filed a request for a formal hearing.  (See id. at 146-47, Exs. 66, 69.)  On July 26, 2002 Dr. Gaines Smith wrote a letter forwarding the formal complaint to Dr. Virginia Caples, Chair of the ACES Grievance Committee, granting a hearing of plaintiff's former complaint and asking Dr. Caples to assign a hearing officer. (See id. at 137, 146-47, Exs. 67-68.)  However, after speaking with Dr. Caples and Barbara Duncan, Dr. Gaines Smith decided a review panel would be the best way to handle

19

plaintiff's complaint.[20]   (See Gaines Smith Dep. at 251-52.)
Plaintiff contends, however, that on November 7, 2002 he spoke
with Dr. Caples who stated she was sorry that she had "dropped
the ball" on his complaint and she would assign a hearing officer
immediately.  (See Borden Dep. Vol. II at 142-43, Ex. 69.)

On November 18, 2002 Dr. Gaines Smith wrote a letter to
plaintiff and Jerry Jackson requesting that they each choose two
members of the review panel and that he would choose the fifth.
(See Borden Dep. Col. II at 139; Gaines Smith Dep. at 249-50.)
On November 22, 2002 plaintiff replied to Dr. Gaines Smith's
letter stating that he believed he was entitled to a hearing
officer and did not want a committee to hear his complaint.  (See
Borden Dep. Vol. II at 140-41, Ex. 69.)  Further, he complained
that as of November 18, 2002 sixty-seven days since his formal
complaint had passed which exceeded the ACES grievance
procedures.  (See id.)

On February 5, 2003 Dr. Gaines Smith offered plaintiff the
option of a hearing officer but plaintiff informed Dr. Gaines
Smith that he did not want to move forward with the grievance
procedure.  (See Gaines Smith Aff. ¶ 6.)  However, on March 7,
2003 Dr. Gaines Smith appointed a hearing officer and a hearing

---

[20] ACES procedures allows the Director to determine whether
a hearing officer or a review panel hearing will be held.  (See
Borden Dep. Vol. II at 136; Gaines Smith Dep. at 251.)

date was set for May 9, 2003.[21]  (See id.)

## IV. Applicable Substantive Law and Analysis

Plaintiff claims disparate treatment racial discrimination, retaliation and hostile work environment under Title VII and § 1983.[22]  The court is aware that the summary judgment rule applies in job discrimination cases just as in other cases.  See Chapman, 229 F.3d at 1025 (rejecting an earlier, contrary general rule and emphasizing that no thumb is to be placed on either side of the scale).

The analysis of the plaintiff's claims will be determined not only by the nature of the allegations but also by the quality of the evidence offered in support of those claims.  See Standard, 161 F.3d at 1330 (noting that "[t]he analytical framework and burden of production var[y] depending on the method of proof chosen").  In general, a plaintiff may attempt to establish a claim of illegal employment discrimination through the use of direct evidence, circumstantial (indirect) evidence, or statistics.  See id.; see also Schoenfeld v. Babbitt, 168 F.3d 1257, 1266 (11th Cir. 1999) (recognizing the availability of

---

[21] This hearing date is ten months after plaintiff's filing of his formal complaint on July 12, 2002.

[22] "The elements of a section 1983 claim of race . . . discrimination are the same as the elements of a Title VII disparate treatment action."  Rice-Lamar v. City of Ft. Lauderdale, Fla., 232 F.3d 836, 843 n.11 (11th Cir. 2000)(citing Cross v. Alabama, 49 F.3d 1490, 1507-08 (11th Cir. 1995).

either direct or circumstantial evidence).  A plaintiff's ability
to proceed through the use of circumstantial evidence of
discrimination is necessarily important because direct proof of
discrimination is uncommon.  See Combs v. Plantation Patterns,
106 F.3d 1519, 1537 (11th Cir. 1997); Grigsby v. Reynolds Metals
Co., 821 F.2d 590, 595 (11th Cir. 1987).  Direct evidence is
"[s]uch evidence [which], if believed, proves the existence of a
fact in issue without inference or presumption." Burns v.
Gadsden State Community College, 908 F.2d 1512 (11th Cir. 1990).
Cf. Wright v. Southland Corp., 187 F.3d 1287, 1293-94 (11th Cir.
1999) (per Tjoflat, J.) (defining direct evidence as "evidence
from which a reasonable trier of fact could find, more probably
than not, a causal link between an adverse employment action and
a protected personal characteristic" and finding the outcomes
reflected in prior case law consistent with that definition); see
also Bass v. Board of County Commissioners, Orange County,
Florida, 242 F.3d 996, 1010 (11th Cir. 2001) (discussing meaning
of "direct evidence" in the context of a Title VII race
discrimination claim; "direct evidence" refers to a type of
evidence which, if true, would require no inferential leap in
order for a court to find discrimination.").  "Direct evidence is
composed of only the most blatant remarks, whose intent could be
nothing other than to discriminate on the basis of some
impermissible factor." Rojas v. Florida, 285 F.3d 1339, 1342,

22

n.2 (11th Cir. 2001)(quoting <u>Schoenfeld v. Babbitt</u>, 168 F. 3d 1257, 1266 (11th Cir. 1999))(citations and quotations omitted). However, direct evidence does not include "stray remarks in the workplace" or "statements by nondecisionmakers" or "statements by decisionmakers unrelated to the decisional process itself." <u>Price Waterhouse v. Hopkins</u>, 490 U.S. 228, 277 (O'Connor, J., concurring) (1989);  <u>see also</u> <u>EEOC v. Alton Packaging Corp.</u>, 901 F.2d 920, 924 (11th Cir. 1990) (quoting <u>Price Waterhouse</u>).

Here, plaintiff has presented only circumstantial evidence of racial discrimination and retaliation.[23]  "In evaluating [discrimination] claims supported by circumstantial evidence, [the courts of this circuit] use the now-familiar framework established by the United States Supreme Court in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), and <u>Texas Department of Community Affairs v. Burdine</u>, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)." <u>Combs</u>, 106 F.3d at 1527.  Under the <u>McDonnell Douglas</u> and <u>Burdine</u> framework, the plaintiff first has the burden of establishing a prima facie case of discrimination, which creates a rebuttable presumption that the employer acted illegally.  <u>See</u> <u>id.</u> at 1527-

---

[23]  The statements alleged by plaintiff regarding his position on Legacy by Dr. McCord and Jerry Jackson's "boy" reference do not constitute direct evidence of discrimination. Rather, they are examples of "stray remarks," unconnected with the decision making process, which do not rise to the level of direct evidence.

28.  The methods of presenting a prima facie case, as well as the exact elements of the case, are not fixed; rather they are flexible and depend to a large degree upon the facts of the particular situation.  See, e.g., Nix v. WLCY Radio/Rahall Communications, 738 F.2d 1181, 1185 (11th Cir. 1984); Lincoln v. Board of Regents of Univ. Sys., 697 F.2d 928, 937 (11th Cir. 1983).  In general, a plaintiff establishes a prima facie case of disparate treatment employment discrimination by showing that he or she was a qualified member of a protected class and was subjected to an adverse employment action but that otherwise similarly situated employees outside the plaintiff's class were treated dissimilarly.[24]  See McDonnell Douglas, 411 U.S. at 802 (hiring); Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997) (per curiam)(discipline); see also Nix, 738 F.2d at 1185 (discipline); Pittman v. Hattiesburg Mun. Separate Sch. Dist., 644 F.2d 1071, 1074 (5th Cir. 1981) (wages).

Once the plaintiff has shown a prima facie case and, thereby, has raised the presumption of discrimination, the burden of production shifts to the employer to articulate a legitimate,

---

[24] See also McDonnell Douglas, 411 U.S. at 802 n.13 ("The facts necessary will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not applicable in every respect in different factual situations.").

nondiscriminatory reason for its actions.[25]  See Rojas, 285 F.3d
at 1342; Combs, 106 F.3d at 1528.  The employer "need not
persuade the court that it was actually motivated by the
proffered reasons."  Burdine, 450 U.S. at 254-55; see Chapman,
229 F.3d at 1024.  If the employer satisfies that burden by
articulating one or more such reasons, then the presumption of
discrimination falls and the burden of production again shifts to
the plaintiff to offer evidence sufficient for a reasonable jury
to conclude that the employer's supposedly legitimate reason is
merely a pretext for illegal discrimination.[26]  Where the
defendant articulates multiple, reasonable, legitimate and
nondiscriminatory reasons, plaintiff must rebut each of
defendant's proffered reasons.  See Chapman, 229 F.3d at 1024-25.
Where plaintiff seeks to prove pretext by showing she was more
qualified than the person given the job or promotion, she "must
adduce evidence that the disparity in qualifications is 'so
apparent as virtually to jump off the page and slap you in the
face.'" Cofield v. Goldkist, Inc., 267 F3d 1264, 1268 (11th Cir.
2001) (quoting Deines v. Texas Dept. of Protective and Reg.

-----

[25] See Chapman, 229 F.3d at 1032 (A subjective reason is a
legally sufficient, legitimate, nondiscriminatory reason if the
defendant articulates a clear and reasonably specific factual
basis upon which the employer based its subjective opinion.).

[26] If the proffered reason is one that might motivate a
reasonable employer, a plaintiff cannot recast the reason but
must meet it head on and rebut it.  Simply quarreling with that
reason is not sufficient.  Chapman, 229 F.3d at 1030.

Sevs., 164 F.3d 277, 280 (5th Cir. 1999)).  Therefore, the
relevant inquiry "is not to judge which employee was more
qualified, but to determine whether any disparity . . . is so
great that a reasonable fact-finder could infer that [defendant]
did not believe" that the person granted the promotion was better
qualified.  Cofield, 267 F.3d at 1268. Although the prima facie
case is irrelevant once the employer has offered a legitimate
reason for its actions, the evidence of pretext may include the
same evidence offered to establish the prima facie case.  See
Combs, 106 F.3d at 1528.

Despite this shifting of the burden of production between
the plaintiff and the defendant under the McDonnell Douglas and
Burdine framework, "[t]he ultimate burden of persuading the trier
of fact that the defendant intentionally discriminated against
the plaintiff remains at all times with the plaintiff." Burdine,
450 U.S. at. 253.  Given that the ultimate burden of persuasion
always lies with the employee, a plaintiff may prevail on an
employment discrimination claim and may also defeat a summary
judgement either by proving that intentional discrimination did
indeed motivate the defendant or by producing sufficient evidence
to allow a rational trier of fact to disbelieve the employer's
proffered legitimate reasons, thus permitting but not compelling
the trier of fact to make a finding of illegal discrimination.
See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147-

48 (2000) (pointing out that the production of the necessary
sufficient evidence by plaintiff will not always prevent the
employer from prevailing on a Rule 50 motion and suggesting that
the strength of plaintiff's prima facie case, the probative value
of the proof that the employer's explanation is false, and any
other properly considered evidence that supports the employer's
case are among other factors to take into account in evaluating a
Rule 50 motion);[27] St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502
(1993); Abel v. Dubberly, 210 F.3d 1334, 1339 (11th Cir. 2000);
Alexander v. Fulton County, 207 F.3d 1303, 1336 (11th Cir. 2000);
Combs, 106 F.3d at 1529-38 (interpreting Hicks and the post-Hicks
case law); Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913,
920-21 (11th Cir. 1993).

## V.  Discussion

As earlier noted, plaintiff's complaint alleges that
defendant is liable for failing to promote plaintiff because of
his race under Title VII and § 1983, retaliation because of race
under Title VII and hostile work environment.  (See Compl.)
Defendant argues that it is entitled to summary judgment as to
plaintiff's race discrimination claims because (1) even assuming
plaintiff can establish a prima facie case of discrimination,

---

[27] The court in Chapman modified the statement in Combs
contrary to this holding in Reeves after noting that the standard
for granting summary judgment mirrors the standard for judgment
as a matter of law.  See Chapman, 229 F.3d at 1025, n.11.

plaintiff cannot rebut defendant's legitimate, nondiscriminatory reason for denying him the promotion; (2) plaintiff cannot establish a prima facie case of retaliation; (3) even assuming plaintiff can establish a prima facie case of retaliation, plaintiff cannot rebut defendant's legitimate, nondiscriminatory reason; and (4) plaintiff was not subject to a hostile work environment on the basis of race.  (See Def.'s Motion for Summary Judgment ¶¶ 1-4.)

## 1.  Disparate Treatment

Plaintiff alleges disparate treatment based on denial of a promotion.  He claims that he was not selected for the Program Coordinator position on the basis of race.  (See Compl.)  In order to prevail on a discriminatory failure to promote claim, the plaintiff must establish a prima facie case of race discrimination by showing the following: (1) he is a member of a protected class; (2) he was qualified and applied for the promotion; (3) he was rejected despite his qualifications; and (4) other equally or less qualified employees who were not members of the protected class were promoted.  See Alexander v. Fulton County, Ga., 207 F.3d 1303, 1339 (11th Cir. 2000)(citing Taylor v. Runyon, 175 F.3d 861, 866 (11th Cir. 1999)).  Again, once the plaintiff has made out the prima facie case of discrimination, the employer must articulate some legitimate, nondiscriminatory reason for the employee's rejection.  See id.

28

(citing <u>Wu v. Thomas</u>, 847 F.2d 1480, 1483-84 (11th Cir. 1988).
If the employer meets this burden of production, the plaintiff
must then establish that the defendant's proffered reason for
promoting another instead of plaintiff was pretextual.   See id.

   Plaintiff clearly makes out a prima facie case of race
discrimination.   He is a member of a protected class, qualified[28]
and applied for the Program Coordinator position, rejected, and a
white female was hired.   He has also presented evidence which
arguably suggests he was equally qualified as the person
selected.   Defendant articulated a legitimate, nondiscriminatory
reason for not promoting plaintiff, namely that the bi-racial
search committee found Schotz to be the best qualified[29] for the
position.[30]   Therefore, the burden shifts back to the plaintiff
to offer evidence sufficient for a reasonable jury to conclude

---

   [28] Defendant states that plaintiff was arguably not
qualified for the position because he only had 2.5 years of
experience in environmental education.   In light of plaintiff's
background and the fact that the committee decided to interview
him for the job, this argument is not persuasive.

   [29] The committee believed she was the best qualified based
upon her credentials, her environmental education knowledge, her
contacts in the environmental community, her vision, her
understanding of the needs of the 4-H Center and her ability to
address those needs.   (See Search Committee Supplemental Report
Sutton Aff. Ex. 4.)   Her interview scores were higher than
plaintiff's scores, and committee members identified plaintiff's
weaknesses as lacking vision, dependability and maturity.   (See
id.)

   [30] Defendant also notes that other white male and female
applicants were rejected for both an interview and the Program
Coordinator position.

29

that the employer's supposedly legitimate reason is merely a pretext for illegal discrimination.

Plaintiff presents two arguments of pretext.  Plaintiff's first argument of pretext is that the search committee did not follow its own procedure.  (See Pl.'s Brief at 18-20.)  Plaintiff argues that Kling broke the established procedures for conducting the search for the Program Coordinator by making comments regarding plaintiff's service to Legacy based upon comments made to her outside of the search process.  Kling informed the committee that Legacy was dissatisfied with plaintiff's service on the Legacy Board and characterized his service as an "ethical" problem in the initial committee report.  (See Kling Dep. at 106-08.)  Plaintiff argues that this is particularly suspicious because Kling withheld from the committee an e-mail from the Chair of the Education Committee of Legacy allegedly criticizing Schotz.  (See Kling Dep. at 133-36, Ex. EK-22.)

Even assuming Kling did deviate from the procedures established for conducting the search, this deviation does not necessarily raise an inference of discrimination.  "Standing alone, deviation from a company policy does not demonstrate discriminatory animus."  Mitchell v. USBI Co., 186 F.3d 1352, 1355-56 (11th Cir. 1999); see also EEOC v. Texas Instruments Inc., 100 F.3d 1173, 1182 (5th Cir. 1996)(deviation from company policy not evidence of discrimination, absent a nexus between

deviation and employee's protected status); <u>Friedel v. City of Madison</u>, 832 F.2d 965, 973 (7th Cir. 1987)(inaccurate application of departmental policy not enough to prove discrimination); <u>Berg v. Florida Dep't of Labor</u>, 163 F.3d 1251, 1255 (11th Cir. 1998)(ADA plaintiff failed to support claim by arguing that state agency failed to apply its policies correctly, absent showing that policies were misapplied because of his disability).  The plaintiff must show that the policy was disparately enforced <u>with discriminatory animus.</u>  <u>See Mitchell</u>, 186 F.3d at 1355-56.  Thus the issue is whether plaintiff offered specific facts showing that the employer misapplied the policy in a disparate manner with an invidious intent.  <u>See id.</u>

Plaintiff attempts to make such an argument but his evidence falls short of suggesting, much less showing, that Kling strayed from the search committee procedures for any nefarious purpose. Plaintiff presented no evidence that Kling made the comments about Legacy's dissatisfaction with plaintiff out of discriminatory animus towards the plaintiff.  The comparison between Kling's comments and her withholding of the e-mail regarding Schotz fails to demonstrate the necessary discriminatory animus.  In substance, the e-mail was not a criticism of Schotz but rather a criticism of the entire Legacy Staff and its decisions to shorten certain Legacy workshops, reduce staff, reduce compensation for summer staffing and the

like.  (See Kling Dep. Ex. EK-22.)  The court agrees that the e-
mail actually only represents a "philosophical difference of
opinion." (Id. at 134, 136.)  Further, the court does not find
this e-mail comparable to the comments about plaintiff's lack of
participation as a Legacy Board member.  Plaintiff's other
argument attempting to establish a nexus between the deviation
from the procedures and plaintiff's race regards Dr. McCord's
inaction when he "had opportunity to shed light on the unfounded
allegations surrounding plaintiff's service to Legacy." (See
Pl.'s Brief at 19.)  This fact, alone or in combination with the
other evidence, simply is insufficient to raise an inference of
discrimination by the search committee's assumed deviation from
procedure in not promoting plaintiff.

Plaintiff's second pretext argument stems from comments made
by Dr. McCord.  The alleged comments include: (1) his instruction
"to limit and closely monitor plaintiff's participation in
Legacy" (see Tatum Dep. at 33-34), (2) his statement that he
agreed that plaintiff and Kathy Rayfield "should be ridden hard
and not be promoted" (see Borden Dep. Vol. II at 176-77) and (3)
his comment "that the only reason plaintiff was asked to serve on
the Legacy board was because he was black." (see Tatum Dep. at
31-43.)  It is not readily apparent that these statements

demonstrate a discriminatory animus by McCord.[31]   In regards to the first statement, the court sees no reason to believe that this statement had anything to do with the plaintiff's race. Jack Tatum, one of plaintiff's former supervisors, testified that "there was some concern about how much time he [plaintiff] would be spending with Legacy. . . . Legacy has so many meetings and we have an environmental program to run.  And there was some concern about, you know, would he be going to Legacy once a week, once a month, whatever."  (See Tatum Dep. at 32-33.)  This testimony in no way indicates that Dr. McCord wanted plaintiff's participation to be monitored because of his race, and there is no other evidence to this effect.  As for the second statement, the comment in no way contains a racial overtone as Kathy Rayfield, about whom the comment was also made, is a white female, and there is no independent evidence to suggest a racial overtone.

Finally, the court agrees with defendant that the third statement amounts to a stray remark in the workplace.  Dr. McCord did not make this statement as part of the decisionmaking process

---

[31] In addition, the court notes that Dr. McCord was not a member of the search committee.  He was present at the second interview of Linda Schotz.  (See McCord dep. at 49.)  In addition, he completed paperwork  approving the committee's recommendation to hire Schotz as the Program Coordinator and forwarded that paperwork up the chain of command for approval. (See McCord Dep. at 49-51; 69-71.)  Due to this extremely limited involvement, the court is leery to designate Dr. McCord as a decisionmaker but will assume so for purposes of this argument only.

for the Program Coordinator decision.  Such a comment does not satisfy plaintiff's burden to prove pretext.  See Norrell v. Waste Away Group, Inc., 246 F.Supp.2d 1213, 1225 (M.D. Ala. 2003)(holding that such stray remarks by the decisionmaker did not establish pretext).  Even assuming that Dr. McCord was a decisionmaker for the Program Coordinator position (see footnote 21), this statement represents an "isolated [remark] unrelated to the challenged employment decision." Rojas, 285 F.3d at 1343. The Rojas court explained that such remarks "are not direct evidence of discrimination" and, if the remark is isolated and unrelated to the employment decision, "it, alone, is insufficient to establish a material fact of pretext." Id.

As such, the plaintiff has failed to rebut as pretext defendant's legitimate and nondiscriminatory reason for the promotion at issue.  See Chapman, 229 F.3d at 1024-25.  Nor has plaintiff otherwise come forward with evidence upon which a reasonable person could conclude that intentional discrimination did indeed motivate the defendant.  Therefore, defendant is entitled to summary judgment in its favor on plaintiff's denial of promotion claim.

## 2.  Retaliation

Plaintiff claims that defendant retaliated against him for

34

complaining of race discrimination in violation of Title VII.[32]
Defendant argues plaintiff cannot establish a prima facie case of
retaliation, and even assuming plaintiff can establish a prima
facie case of retaliation, plaintiff cannot rebut defendant's
legitimate, nondiscriminatory reason for its actions.

Generally, to establish a prima facie case of retaliation a
plaintiff must show: (1) that he engaged in protected activity;
(2) that his employer was aware of that activity; (3) that he
suffered an adverse employment action; and (4) there was a causal
link between his protected activity and the adverse employment
action.[33] Maniccia v. Brown, 171 F.3d 1364, 1369 (11th Cir.
1999) (citing Little v. United Techs., 103 F.3d 956, 959 (11th
Cir. 1997)); Holifield v. Reno, 115 F.3d 1555, 1556 (11th Cir.
1997) (per curiam). Statutorily protected expression includes
filing complaints with the EEOC and complaining to superiors
about harassment. See Rollins v. States of Fla. Dep't of Law
Enforcement, 868 F.2d 397, 400 (11th Cir. 1989)("the protection
afforded by the statute is not limited to individuals who have
filed formal complaints, but extends as well to those, like
plaintiff, who informally voice complaints to their superiors or

---

[32] Plaintiff does not claim that he was retaliated against
in violation on 42 U.S.C. § 1983.

[33] The burden-shifting framework outlined above for
discrimination claims also applies to retaliation claims. See,
e.g., Sullican v. National R.R. Passenger Corp., 170 F.3d 1056,
1059 (11th Cir. 1999).

who use their employer's internal grievance procedures."). As such, plaintiff engaged in protected activity when he complained to Barbara Duncan of race discrimination in February of 2001 and when he filed his EEOC charge in May of 2001.

Plaintiff alleges that he suffered numerous adverse employment actions. "An adverse employment action is an ultimate employment decision, such as discharge or failure to hire, or other conduct that 'alters the employee's compensation, terms, conditions, or privileges of employment, deprive him or her of employment opportunities, or adversely affects his or her status as an employee.'" Gupta v. Florida Bd. of Regents, 212 F.3d 571, 587 (11th Cir. 2000)(quoting Robinson v. City of Pittsburgh, 120 F.3d 1286, 1300 (3d Cir. 1997)). Not all conduct by an employer negatively affecting an employee constitutes an adverse employment action. See Davis v. Town of Lake Park, Fla., 245 F.3d 1232, 1238 (11th Cir. 2001). If the employer's conduct does not rise to the level of an ultimate employment decision, it must meet "some threshold level of substantiality . . . to become cognizable under the anti-retaliation clause." Wideman v. Wal-Mart Stores, Inc., 141 F.3d 1453, 1456 (11th Cir. 1998). This limitation is consistent with the basic principle that "Title VII [ ] is neither a general civility code not a statute making actionable the 'ordinary tribulations of the workplace.'" Gupta, 212 F.3d at 587(quoting Anderson v. Coors Brewing Co., 181 F.3d

36

1171, 1178 (10th Cir. 1999)).

Plaintiff presented evidence that he was subject to the following actions, which he contends are adverse employment actions: (1) he was subjected to harsher reprimands than others (see Borden Dep. Vol. II at 38-40); (2) he was subjected to public discipline in front of his peers and co-workers while others were reprimanded privately (see id. at 35); (3) he was not given the complete 5% raise until after he complained and when he did question the amount Dr. McCord because aggravated and raised his voice (see Borden Dep. Vol. I at 78, 200-01); and (4) he did not receive a hearing on his formal grievance until almost a year later in violation of the System's own procedures.

The first two listed actions that plaintiff complains of are not "adverse employment actions."[34]  None of those actions were "objectively serious and tangible enough" to alter plaintiff's "compensation, terms, conditions or privileges of employment, . . . deprive [him] of employment opportunities or adversely affects . . . [his] status as an employee."  Robinson, 120 F.3d at 1300 (internal marks omitted).   Additionally, plaintiff has not produced any evidence showing the court how the time lag in the grievance procedure adversely affected plaintiff.  Plaintiff's

---

[34] The court reaches this conclusion considering all of his allegations individually and collectively.  See Wideman, 141 F.3d at 1456.

brief states that on "May 15, 2002[35] plaintiff filed a formal
grievance" based upon the comments of Jerry Jackson but "despite
the defendant's own policies and procedures calling for a formal
hearing to be held within sixty days," plaintiff's hearing was
not scheduled until May 9, 2003.  (See Pl.'s Brief at 23.)  The
court finds that this delay was not "objectively serious and
tangible enough" to alter plaintiff's "compensation, terms,
conditions or privileges of employment, . . . deprive [him] of
employment opportunities or adversely affects . . . [his] status
as an employee."  Robinson, 120 F.3d at 1300 (internal marks
omitted).  Plaintiff has not provided any evidence or case law to
convince the court otherwise.

The only action taken by defendant that comes even close to
an adverse employment action is plaintiff's claim regarding the
merit pay raise.  Plaintiff received less than the full five
percent raise he was informed that he would receive.[36]  (See
Borden Dep. Vol. I at 200-01.)  This denial of the full pay
raise, though likely de minimis as it amounted to about $20 a

---

[35] Plaintiff testified that the actual date he filed his
formal grievance with Dr. Gaines Smith was July 12, 2002 and the
date he filed his formal request for hearing was July 15, 2002.
(See Borden Dep. Vol II. at 146-47, Exs. 66, 69.)

[36] Plaintiff stated that he received a 4.413% raise instead
of the promised 5% raise.  (See Borden Dep. Vol. I at 206.)  The
reduced amount was paid for about four months after which the
correct 5%, with a supplement to correct for the small shortage
during those four months, was paid.

month for four months, affected plaintiff's compensation, and the court assumes it constitutes an adverse employment action.

Accordingly, the court proceeds to determine whether there is a causal connection between plaintiff's participation in a protected activity and the adverse employment action. "To establish a causal connection, a plaintiff must show that 'the decision-maker[s] [were] aware of the protected conduct' and 'that the protected activity and the adverse action were not wholly unrelated.'" Gupta, 212 F.3d at 590 (quoting Farley v. Nationwide Mut. Ins., 197 F.3d 1322, 1377 (11th Cir. 1999). The causal link element is generally construed broadly so that "a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated." Olmstead v. Taco Bell Corp., 141 F.3d 1457, 1460 (11th Cir. 1998). Thus, a "close temporal proximity" between the plaintiff's protected conduct and an adverse employment action generally is sufficient circumstantial evidence of a causal connection for purposes of a prima facie case. See id. On the other hand, the Eleventh Circuit has indicated that a substantial delay between the protected activity and the adverse employment action and the absence of other evidence tending to show causation may justify judgment as a matter of law for the employer. See Wascura v. City of South Miami, 257 F.3d 1238, 1248 (11th Cir. 2001); Maniccia v. Brown, 171 F.3d 1364, 1370

(11th Cir. 1999).  Moreover, the Supreme Court stated that "mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action . . . must be 'very close.'" Clark County School Dist. v. Breeden, 532 U.S. 268, 273 (2001)(citations omitted).  In Breeden the Supreme Court found a twenty month disparity was insufficient to show causal connection.  See id. at 273-74.  The Court also cited with approval cases holding that a three to four month disparity was also insufficient.  See id. (citing Richmond v. ONEOK, 120 F.3d 205, 209 (10th Cir. 1997)(3-month period insufficient) and Hughes v. Derwinski, 967 F.2d 1168, 1174-75 (7th Cir. 1992)(4-month period insufficient).

Plaintiff first engaged in protected activity in February of 2001 when he complained of race discrimination and again when he filed a charge of discrimination with the EEOC on May 2, 2001. The denial of the full 5% raise occurred in October 2002. Therefore between plaintiff's first complaint and the adverse employment action twenty months passed; between the EEOC charge and the adverse employment action seventeen months passed.  The court is unwilling to assume that the twenty month and seventeen month periods are sufficient to establish a prima facie case of retaliation.  See Clark County School Dist., 532 U.S. at 273-74 (stating that "mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action

40

. . . must be 'very close'" and citing approval cases holding

three and four month disparities as insufficient).  As such,

plaintiff has not established a prima facie case of

retaliation.[37]  Summary judgment is therefore appropriate as to

plaintiff's retaliation claims.

**3.  Hostile Work Environment**[38]

Plaintiff claims that he was subjected to a hostile work

environment on the basis of his race.  Defendant argues plaintiff

cannot establish a prima facie case of a hostile work

environment.  The court agrees.

To establish a prima facie case of a hostile work

_____

[37] Alternatively, even if the court were to assume _arguendo_
that plaintiff is able to establish a prima facie case with
regard to the pay raise, plaintiff has not produced any evidence
to rebut defendant's legitimate, nondiscriminatory reason for its
failure to award plaintiff the full five percent raise.
Defendant states that this failure was simply a miscalculation.
(_See_ McCord Dep. at 78-79.)  Further, this miscalculation was
corrected after four months and implemented retroactively to the
time plaintiff should have received the full five percent.  (_See_
Gaines Smith Aff. § 7.)  Without any evidence that defendant was
motivated by race, plaintiff cannot establish his evidentiary
burden and his claim fails as a matter of law.  _See_ _Alexander_,
207 F.3d at 1339.

[38] The court notes that counsel for plaintiff represented to
the court during the pretrial conference that they were not
pursuing their hostile work environment claim; however,
plaintiff's brief contains an entire section and separate
argument devoted to why defendant is not entitled to summary
judgment with respect to plaintiff's hostile work environment
claim.  (_See_ Pl.'s Brief at 24.)  Because only two of plaintiff's
four attorneys were present at the pretrial conference, the court
can only assume that either the third attorney who also signed
the brief, or the fourth attorney of record, or both convinced
the two present at pretrial to pursue the claim.

41

environment, a plaintiff must show that (1) he belongs to a protected class; (2) he was subjected to unwelcome harassment; (3) the harassment was based upon his race; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable.  See Gupta 212 F.3d at 582-83; Mendoza v. Borden, Inc., 195 F.3d 1238, 1245 (11th Cir. 1999).  It is undisputed that plaintiff is a member of a protected class.

However, plaintiff has not produced evidence sufficient to demonstrate that any harassment he faced was "sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment."  See Gupta, 212 F.3d at 582-83. This requirement tests the legitimacy of most harassment claims and is therefore regarded as crucial.  See id. at 583 (citing Faragher v. City of Boca Raton, 524 U.S. 775, 778 (1998)).  The "'mere utterance of an . . . epithet which engenders offensive feelings of an employee' . . . does not sufficiently affect the conditions of employment."  Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)(quoting Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986)).  Only when a workplace is "permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe to alter the conditions of the employment and create an abusive working environment'" is the law violated.

42

Harris, 510 U.S. at 21 (quoting Meritor, 477 U.S. at 65-66)).

Accordingly, in order to establish that harassing conduct was sufficiently severe or pervasive to alter an employee's terms or conditions of employment, the employee must meet both a subjective and objective test.  See Mendoza, 195 F.3d at 1246. The employee must establish not only that he subjectively perceived the environment as hostile, but also that a reasonable person would perceive the environment to be hostile and abusive. Watkins v. Bowden, 105 F.3d 1344, 1355-56 (11th Cir. 1997).  The objective severity of harassment should be judged from the perspective of a reasonable person in the employee's position, considering all the circumstances.  Id.  See Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998).

Although the court examines the statements and conduct complained of collectively in determining whether they were sufficiently pervasive or severe to constitute racial harassment, the statements or conduct must be related to plaintiff's race. See Gupta, 212 F.3d at 583 (stating in sexual harassment cases "the statements and conduct must be of a sexual or gender-related nature . . . before they are considered in determining whether the severe or pervasive requirement is met.") Isolated and innocuous incidents, even if intentional, will not support a hostile environment claim and are not counted.  See id.

Plaintiff claims that Schotz "harassed" him by questioning

43

him in front of peers and co-workers and "yelled" at him.  (See
Borden Dep. Vol. II at 35, 38-40, 52-55, 87-92.)  He also stated
that Schotz subjected him to public discipline while others were
reprimanded privately.  (See id. at 35.)  Additionally, plaintiff
claims Dr. McCord became aggravated and raised him voice when
plaintiff asked him about the discrepancy in his 5% raise.  (See
Borden Dep. Vol. I at 204.)  His final evidence of a hostile work
environment is Jerry Jackson's reference to plaintiff as "boy" in
front of peers and co-workers.  (See Borden Dep. Vol. II at 103-
05.)

     The only comment that is even arguably related to
plaintiff's race is Jackson's addressing plaintiff as "boy."
This comment, standing along with all other evidence, does not
establish that the harassing conduct was sufficiently severe or
pervasive to alter the plaintiff's terms or conditions of
employment.  Thus, plaintiff has failed to establish a prima
facie case by failing in his burden to produce evidence, whether
viewed objectively or subjectively, that any harassment he faced
was "sufficiently severe or pervasive to alter the conditions of
employment and create an abusive working environment."  Gupta,
212 F.3d at 582-83.  Summary judgment is, therefore, also
appropriate as to plaintiff's hostile work environment claim.

     In summary, the court finds that no material issues of fact
remain and that defendant is entitled to judgment as a matter of

law as to all claims asserted by plaintiff.  A separate order
will be entered.

DONE this 2nd day of June, 2003.


_____
SENIOR UNITED STATES DISTRICT JUDGE